# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

PETER MICHAEL ROWE,

Plaintiff,

v.                                                   5:14-CV-67
                                                     (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
DAVID L. MYERS, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On April 5, 2011, plaintiff "protectively filed"[1] an application for Disability

Insurance Benefits ("DIB"). (Administrative Transcript ("T") 49, 119-20).  Plaintiff

alleged disability, beginning on March 21, 2008, due to anxiety; "ear ringing;" high

blood pressure; and allergies to food, animals, and pollen. (T. 157).  Plaintiff's

application was initially denied on July 20, 2011. (T. 49).  On November 14, 2012,

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§ 404.630, 416.340.  If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

Administrative Law Judge ("ALJ") Jennifer Gale Smith conducted a hearing, at which plaintiff testified. (T. 26-48). The ALJ denied plaintiff's application in a decision dated November 27, 2012, (T. 11-19), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on December 23, 2013. (T. 1-6).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or Supplemental Security Income ("SSI") disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a) (3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next

2

considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  **FACTS**

Plaintiff's date of birth is December 3, 1952, and he was 55 years old on the alleged disability onset date. (T. 27, 153). Plaintiff has a high school diploma and has previously worked as a construction equipment operator. (T. 157-58). He testified at the hearing that he worked for New York State, doing highway maintenance. (T. 28-29). In his application for benefits, plaintiff claimed disability due only to anxiety;

ringing in his ears (tinnitus); hypertension (high blood pressure); and allergies. (T. 157). At the hearing, plaintiff testified that in 1972, he suffered an injury to his eyes from a battery acid spark. (T. 31). He testified that his eyes were still sensitive as the result of that injury, that he had to wear tinted glasses, and that his eyesight caused him to have headaches. (T. 27, 30-32, 44-45). At the hearing, plaintiff also claimed disability due to back pain. (T. 30, 33).

Plaintiff testified that his most "disabling" impairment was his tinnitus. (T. 30). Plaintiff stated that he could hear the ALJ's questions, but the ringing in his ears was making it difficult. (T. 30). Plaintiff testified that when he tries to watch a movie, he does not "catch" all of the words, and he must turn the volume up on the television. (T. 40). Plaintiff testified that he does not have a particular doctor treating him for his low back pain because he takes Tylenol or Advil as needed, and he does not believe that there is anything that a doctor can do for "it." (T. 33, 35). He estimated that he could walk about 500 feet, stand for about 15 to 20 minutes, and sit for approximately half an hour before his low back began to bother him. (T. 35). He estimated that he could lift approximately 25 to 30 pounds, but he could carry approximately 50 pounds for a short distance. (T. 35-36). He also testified that his legs were "good and strong." (T. 36).

Plaintiff attributed his anxiety to taking care of his wife, who is totally disabled. (T. 36). Plaintiff stated that he had to wait on her hand and foot, including *inter alia*, driving her to doctors' appointments; helping her with personal hygiene; cooking, cleaning; doing laundry; paying bills; and some gardening. (T. 38, 40-43). He testified that he is overwhelmed by these responsibilities. (T. 41). As a result of his anxiety

disorder, plaintiff gets angry and flies off the handle. (T. 45-46). He also testified that at times, his anxiety affects his focus and concentration. (T. 46). Plaintiff is taking medication for his tinnitus, his hypertension, and his anxiety. (T. 34, 40).

Plaintiff's treating physician is Lynne DiGennaro, M.D., a Family Practice Physician, who plaintiff sees for general medical care, hypertension, high cholesterol, and who has prescribed medication for his anxiety. (T. 206-221, 266-74). The record also contains "industrial hearing test" reports from November 9, 2001 to November 16, 2007, conducted by Lawrence Furco and Margaret Whalen.[2] (T. 199-204). On February 22, 2010, Trista Channels, an Audiologist completed a report, stating that plaintiff had a service-connected hearing loss and tinnitus. (T. 205).

Ron Lather, M.D. treated plaintiff for allergies. His reports are dated December 1, 1974[3] to April 26, 2011.[4] (T. 222-27, 257-65). On November 17, 2011, plaintiff was examined by Walter Short, M.D., an orthopedic surgeon for "dysfunction and/or pain in the LEFT index finger." (T. 275-77). On July 12, 2011, plaintiff was seen by two consultative examiners: Dr. Dennis M. Noia, Ph.D., who examined plaintiff's mental

---

[2] The hearing tests appear to be work-related and were conducted during the time that plaintiff was working for the New York State Department of Transportation. Mr. Furco conducted most of the yearly tests. Ms. Whalen conducted the November 16, 2007 test. (T. 204). Lawrence Furco and Margaret Whalen do not appear to be physicians, and their actual qualifications are not in the record.

[3] One office note is dated in 1974. (T. 261). On the same page, there is a note dated May 24, 1978, and one dated June 22, 1981. (*Id.*) There is also a separate page with a typewritten report indicating that on June 22, 1981, Dr. Lather sent the biopsy of a mole ("dermal nevus") to a laboratory in New Orleans, LA for testing. (T. 266). The rest of the progress notes begin in April of 1998. (T. 261).

[4] The second set of reports contains duplicates of the first set of documents. (T. 222/258, 224/262, 225/263, 226/264, 227/260).

status, and Dr. Kalyani Ganesh, M.D., who conducted a physical examination. On July 20, 2011 a Psychiatric Review Technique was completed by non-examining psychologist, T. Andrews, to assess the severity of plaintiff's mental condition. (T. 236-49). Finally, after the hearing, but prior to the record closing before the ALJ, plaintiff submitted office treatment records, dated November 25, 2008 to December 15, 2010, from the Costello Eye Group. Relevant details regarding the medical and other evidence, including the medical opinion evidence, are discussed below as necessary to address the issues raised by plaintiff.

## IV.  THE ALJ'S DECISION

In this case, the ALJ stopped at Step Two of the sequential evaluation. The ALJ found that although plaintiff had several "medically determinable" impairments, none of them, either singly or in combination, were "severe." (T. 13-19). Plaintiff had the following medically determinable impairments: adjustment disorder with depressed mood; hypertension; tinnitus; hearing loss; vision problems; back pain; allergies; and status post crush injury of the left index finger." (T. 13).

In making the severity determination, the ALJ examined the record for clinical evidence of the existence of these impairments. (T. 13-14). The ALJ cited plaintiff's 1972 eye injury, in which battery acid splashed into eyes, resulting in eye sensitivity, requiring plaintiff to wear tinted glasses. (T. 13). In addition, the plaintiff has been

diagnosed with hyperopia[5] and presbyopia.[6] (T. 13) (citing T. 278-85). Thus, the ALJ

found that plaintiff's vision problems were medically determinable. When plaintiff saw

Dr. Short in 2011, the doctor found a thickened longitudinal band in the volar aspect of

the index finger with an old scar. Dr. Short ultimately diagnosed contracture, but stated

that surgical correction was not warranted because plaintiff told Dr. Short that he was

able to perform all of his usual activities.[7] (T. 13) (citing T. 275-77). Thus, the ALJ

found plaintiff's finger impairment to be "medically determinable."

The ALJ found that plaintiff's allergies were "medically determinable" because

plaintiff underwent allergy testing in 2007, after which it was determined that plaintiff

was allergic to a variety of substances, including dog hair, feather mix, house dust and

mites, mold, grass, red birch trees, but no foods. (T. 14) (citing T. 222-27). Plaintiff

takes prescribed allergy medication. (*Id.*) The ALJ also noted that plaintiff was

diagnosed with hypertension for which he takes prescribed medication. (T. 14) (citing

T. 206-221). Plaintiff's anxiety was medically determinable because Dr. DiGennaro

diagnosed him with unspecified anxiety state, after he complained of anxiety, mainly as

a result of his wife's poor health, and Dr. DiGennaro's examination revealed that

plaintiff was irritable, short-tempered, and had poor energy. (T. 14) (citing T. 206-221).

Dr. DiGennaro prescribed medication for plaintiff's anxiety. (*Id.*) Consultative

---

[5] Hyperopia is also known as farsightedness. https://www.nei.nih.gov/eyedata/hyperopia

[6] Presbyopia is the inability to focus on nearby objects. http://www.mayoclinic.org/diseases-conditions/presbyopia/basics/definition/con-20032261.

[7] Dr. Short's report indicates that plaintiff was also evaluated and treated for contracture to his left index finger in 2003. (T. 276).

psychologist, Dr. Dennis Noia diagnosed an adjustment disorder with anxious mood and noted that plaintiff occasionally had difficulty dealing with stress. (T. 14) (citing T. 228-31).

Plaintiff's "low back pain" was first[8] mentioned by Dr. DiGennaro in April of 2012, when plaintiff complained of "right hip pain" after "heavy lifting of his pet tortoise." (T. 14) (citing T. 266-74). After her examination, Dr. DiGennaro diagnosed a pulled muscle in the lumbar area and recommended treatment with ice/heat, topical ointments and over-the-counter pain medication. (*Id.*) The ALJ found that "back pain" was a medically determinable impairment. Finally, the ALJ found that plaintiff's tinnitus was a medically determinable impairment because his hearing loss/tinnitus was a "service connected impairment," for which plaintiff took over-the-counter Lipo-Flavonoid Plus twice per day. (T. 14) (citing T. 199-204).

Plaintiff testified that he gets headaches when he takes his glasses off, and when it is sunny outside, he gets migraines and goes "snow blind." (T. 14) Plaintiff stated that, as a result, he avoids the sun and takes over-the-counter medication for his headaches. The ALJ correctly found that plaintiff's headaches had not been established by medically acceptable clinical or laboratory diagnostic techniques because there was no evidence that he mentioned these headaches to his optometrist, primary care

---

[8] On April 19, 2011, "low back pain" was mentioned in a "Nurse's Note" at the top of one of Dr. DiGennaro's medical reports. (T. 218). It is the same report in which plaintiff's anxiety is mentioned for the first time by the doctor. However, while Dr. DiGennaro discusses anxiety in the contemporaneous report, she never mentioned back pain anywhere in the report, notwithstanding the "nurse's" note at the top of the page. (T. 218-19). Thus, the doctor, herself, does not discuss plaintiff's back pain until April of 2012. (T. 266).

9

physician, or either consultative examiner. (T. 14).

Once the ALJ found that plaintiff has medically determinable impairments, she completed the Step Two analysis by determining whether those medically determinable impairments significantly limited (or were expected to significantly limit) plaintiff's ability to perform basic work activities. The ALJ determined that none of the medically determinable impairments, either singly or in combination, would substantially limit his ability to perform basic work activities. (T. 15-19). Therefore plaintiff did not have a severe impairment or combination of impairments, and the ALJ denied plaintiff's claim at Step Two.

## V.  ISSUES IN CONTENTION

Plaintiff raises the following arguments:

(1)  The ALJ erred in determining that plaintiff did not have a severe impairment or combination of impairments and should not have denied plaintiff's claim at Step Two. (Pl.'s Br. at 6-9) (Dkt. No. 11).

(2)  The ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. at 9-11).

Defendant argues that the ALJ's determination is supported by substantial evidence, and that the Commissioner's final decision should be affirmed. (Dkt. No. 12). For the following reasons, this court agrees with defendant and will recommend dismissing the complaint.

## VII.  SEVERE IMPAIRMENT

### A.  Legal Standards

The claimant bears the burden of presenting evidence establishing severity at

Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404. 1521(b).  "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL

294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.* The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

## B. Application

ALJ Smith concluded that plaintiff's "conditions, whether considered singly or in combination with other impairments, are only slight abnormalities and have no more than a minimal effect on his ability to perform work-related tasks." (T. 19). Even though plaintiff has multiple impairments, in this case, he argues only that his anxiety is severe. (Pl.'s Br. at 8). This court finds that the ALJ's decision is supported by substantial evidence with respect to all of plaintiff's impairments.

The ALJ correctly stated that although plaintiff reported anxiety, he denied ever seeing a psychiatrist, being hospitalized for psychiatric treatment, or receiving any

12

mental health treatment. (T. 18). Although plaintiff claimed disability beginning in 2008, and listed anxiety on his April 5, 2011 application as one of the causes of his disability on April 5, 2011, (T. 157), he never mentioned anxiety to Dr. DiGennaro, or any other doctor, until April 19, 2011. (T. 218). None of Dr. DiGennaro's prior reports even remotely discuss anxiety or any kind of psychiatric or psychological problems. (T. 206- 1/5/10; 208- 2/18/10; 210- 5/18/10; 212- 6/22/10; 214- 9/23/10; 216-1/13/11). In fact, most of Dr. DiGennaro's reports discuss only plaintiff high blood pressure and cholesterol.[9]

On April 19, 2011, after plaintiff told Dr. DiGennaro that he was anxious about his wife's health,[10] the doctor diagnosed "Anxiety State Unspec." and prescribed Citalopram[11] Hydrobromide "20 mg 1 po qd."[12] (T. 218-19). On August 11, 2011, Dr. DiGennaro reported that plaintiff was taking his anxiety medication as prescribed, that there were no side effects, and that plaintiff "reports anxiety has improved." (T. 270). Plaintiff denied sleep problems or suicidal thoughts. Dr. DiGennaro's assessment was

---

[9] Plaintiff's blood pressure was consistently listed as "mostly well controlled." (T. 208, 210, 212, 214, 216, 218, 268, 270). Plaintiff's cholesterol is not an issue.

[10] The court notes that plaintiff testified that he wife was dependent on him since before he stopped working in 2008. (T. 37).

[11] Citalopram, (also known by brand name Celexa) is listed as a medication used to treat depression, and is classified as a "selective serotonin reuptake inhibitor." It is thought to work by increasing the amount of serotonin, a natural substance found in the brain which helps to maintain "mental balance." www.nlm.nih.gov/ medicineplus/druginfo/meds/a699001.html#why. The "usual" initial dose is 20 mg orally, once per day. www.drugs.com/citalopram.html. Maintenance dose is 20 to 40 mg per day. *Id.*

[12] The abbreviation means that plaintiff was prescribed twenty milligrams of the medication once per day (qd) by mouth (po).

that plaintiff's anxiety was "adequately controlled." (T. 271).

On November 15, 2011, the first page of Dr. DiGennaro's report states that plaintiff was "[t]aking medication as prescribed . . . . Reports anxiety has improved. . . ." (T. 268). However, on the next page, under the heading "Assessment #3," the doctor stated that plaintiff's anxiety was not adequately controlled, and that she was going to "increase" his medication "to 20mg qday until he recovers from the loss of his stepson." (T. 269). However, the dosage listed as an "increase" in medication is the same dosage she prescribed when she first diagnosed the anxiety. (T. 219).

Plaintiff's counsel claims Dr. DiGennaro "noted" that plaintiff was still taking the "increased" dosage a year later, on April 24, 2012.[13] (Pl.'s Br. at 8) (citing T. 266). The narrative report cited by plaintiff does not even mention plaintiff's anxiety. (T. 266). Plaintiff saw Dr. DiGennaro on April 24, 2012 because he hurt his right hip the night before. The report simply listed plaintiff's "Current Meds Prior to Visit." (T. 266). One of those medications was Citalopram, "20 mg 1 po qd," the **_same dosage_** as the first time Dr. DiGennaro prescribed the drug, not an increased dosage.[14] The narrative part of the April 24, 2012 report only discussed the fact that plaintiff hurt his hip "following heavy lifting of his pet tortoise." (T. 266). The April 24, 2012 report is

---

[13] Plaintiff is trying to show that his anxiety was "severe" because he was still taking the increased dosage a year later.

[14] If on November 15, 2011, Dr. DiGennaro meant to say that she was increasing the dosage 20 mg (not "to" 20 mg as she actually wrote), the court's finding would still be the same. If plaintiff was taking two 20 mg pills for a short period of time because his stepson passed away, causing him greater anxiety, it would be perfectly reasonable, and even Dr. DiGennaro stated that she was going to increase the dosage temporarily. It was clear by April of 2012, that plaintiff was back down to one 20 mg pill per day. (See T. 266 - "Current Meds Prior to Visit: Citalopram 20 mg 1 po qd").

the last report in the record written by Dr. DiGennaro.[15]  Thus, Dr. DiGennaro's reports do not support plaintiff's argument that his anxiety was "severe."

Because the ALJ found that anxiety was a medically determinable impairment, she also considered the effect that the anxiety had on the four broad functional areas listed in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments, known as the "paragraph B" criteria.[16] (T. 18-19).  The functional areas are activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(C).  If the plaintiff's medically determinable impairment causes no more than a "mild" limitation in any one of the first three functional areas and "no" episodes of decompensation of extended duration in the fourth area, the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1).

Plaintiff had no limitations in the first functional area of activities of daily living. He testified that he engaged in a broad range of daily activities, not only for himself, but for his wife.  He is able to cook; clean and do home improvements; do laundry; shop; garden (including mowing the lawn); manage money; drive; take his wife to doctors appointments; and help her with her personal hygiene. (T. 38-43).  There was no evidence that plaintiff's daily activities are restricted.

---

[15] At the November 14, 2012 hearing, plaintiff testified that "I've had to upgrade [the dosage] by two pills *with my wife's condition*, being she couldn't breathe, and she's in the hospital now." (T. 34).  Dr. DiGennaro stated that the dosage was being "increased" in November of 2011, due to the passing of plaintiff's stepson. (T. 269).  Plaintiff did not mention his stepson's passing at the hearing.

[16] The regulations list the four broad functional areas in 20 C.F.R. § 1520a(c)(3).

Giving the plaintiff the "benefit of the doubt," the ALJ found a "mild" limitation in social functioning. (T. 18). Plaintiff told Dr. Noia that he got along well with family and friends. (T. 230). The ALJ also noted that plaintiff's "Activities of Daily Living" form states that plaintiff has no trouble getting along with bosses, teachers, police, landlords or other people of authority. (T. 140). Although plaintiff testified that he "flies of the handle," according to Dr. DiGennaro, the medication has helped his anxiety.[17] (T. 250). In determining that plaintiff had a "mild" limitation in social functioning, the ALJ took into account that plaintiff took care of his wife "24/7," which would clearly restrict plaintiff's ability to socialize. (T. 18). However, he was not restricted due to his own condition.

The ALJ found that plaintiff had no limitations in concentration, persistence or pace. (T. 18). Plaintiff testified that due to his anxiety, he was always thinking about the next thing, and he did not finish things he started. (T. 46). However, in plaintiff's Activities of Daily Living form, plaintiff stated that he did not finish things he started, because of "too many interruptions," due to his wife's disability, not due to his anxiety. (T. 140). The ALJ noted that plaintiff was able to take care of his wife, which could be quite demanding, physically and emotionally without any particular assistance. (T. 18).

The ALJ commented that she observed the plaintiff throughout the hearing, and he had no problem concentrating; paid attention; processed the questions without difficulty; and responded to questions appropriately and without delay. (T. 18).

---

[17] Dr. DiGennaro never discussed any limitations cause by plaintiff's anxiety. Only Dr. Noia's report and the non-examining psychologist's report discuss actual "limitations."

16

Plaintiff argues that the ALJ erred in relying on her own "observations" of plaintiff, citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981).[18]

In *Aubeuf*, the Second Circuit questioned the ALJ's use of a "sit and squirm" test for determining whether a claimant was suffering from disabling pain because the ability to sit through a short administrative hearing would not necessarily undermine plaintiff's claims of pain relative to his or her ability to work on a regular basis. *Id.* First, the principle of *Aubeuf* does not apply to this case. The issue in *Aubeuf* was whether the claimant was suffering disabling pain, and the court questioned the ALJ's unsupported assumption that Aubeuf's lack of discomfort during the hearing, rendered her testimony incredible.

In this case, the ALJ's comment that plaintiff was not having difficulty concentrating and answered questions appropriately and without delay was not an *unsupported* "medical determination,"[19] it was an observation of plaintiff's that was consistent with Dr. Noia's opinion that plaintiff's demeanor and responsiveness to questions was cooperative, his thought processes were coherent and goal directed with no evidence of delusions, hallucinations or disordered thinking. (T. 229-30). Dr. Noia specifically stated that plaintiff's "attention and concentration [were] intact. He was able to do counting, simple calculations, and serial 3s." (T. 230). His intellectual

---

[18] Plaintiff cited *Aubeuf* in his credibility argument. (Pl.'s Br. at 9-10). However, the ALJ used her observations of plaintiff in determining whether he had a severe impairment under the regulations. This court's discussion of *Aubeuf* applies to both arguments.

[19] It is true that the ALJ may not substitute her own lay opinion for competent medical opinion. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *Walker v. Astrue*, No. 08 CV 828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citations omitted).

functioning was estimated to be in the average range, his insight was good, and his judgment was good. (*Id.*) The ALJ's observation merely confirmed Dr. Noia's finding regarding plaintiff's ability to concentrate.

Plaintiff also argues that because Dr. Noia stated that plaintiff's "recent and remote memory skills were "mildly to moderately impaired," plaintiff's anxiety was severe. Recent and remote memory skills are not listed in the broad areas of functioning that must be considered to establish a severe impairment. In any event, Dr. Noia stated that plaintiff's memory skills were "*mildly* to moderately impaired," but that he was able to recall three objects immediately and one after five minutes, restate 5 digits forward and 3 digits backward. (T. 230). Basic mental work activities require only the ability to understand, carry out, and remember *simple* instructions; use judgment; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in a routine work setting.

Notwithstanding his comment about plaintiff's memory, Dr. Noia *concluded* that vocationally plaintiff was capable of performing all of the mental functions required for basic work activities. (T. 230-31). Dr. Noia specifically stated that plaintiff was able to perform simple and some complex tasks; "capable of maintaining attention and concentration for tasks;" was capable of learning new tasks, making appropriate decisions, and relating and interacting moderately well with others. (*Id.*) Dr. Noia stated only that plaintiff "appears to be having occasional difficulty dealing with stress." (T. 230-31). Plaintiff was able to perform all the activities in three of the four broad areas of functioning with some "mild" difficulties in social functioning.

18

Finally, plaintiff had no periods of decompensation of extended duration. (T. 19). He never went to the emergency room or was hospitalized for psychiatric treatment. (T. 19). The ALJ properly concluded that plaintiff's mental impairment was not severe because it caused no more than mild limitation in any of the first three broad areas, and because plaintiff had no episodes of decompensation.

Even though plaintiff now argues that only his anxiety was severe, the court notes that the ALJ also carefully considered plaintiff's other medically determinable impairments and found them not severe. (T. 19). With respect to the ringing in plaintiff's ears, the ALJ pointed out that all the clinical audiological findings were normal, and Dr. Ganesh reported that plaintiff's ears were normal. (T. 16). Plaintiff stated that he could follow spoken instructions, and he was taking medication that helped somewhat. (*Id.*) There was no indiction that plaintiff had any trouble hearing during the consultative examinations, nor did he have trouble at the hearing. The ALJ also found that plaintiff had been able to work at his prior occupation for over 30 years with the ringing in his ears.

The same was true for the impairment in plaintiff's vision and any problem he had with his left index finger. The ALJ stated that "[t]he fact that his hearing, ringing in his ears, vision, and left index finger problems did not prevent the claimant from working strongly suggests that [they] would not currently prevent work. (T. 17). In addition, the ALJ considered that the objective findings regarding all of these impairments did not support a finding of severity for any of them alone or in combination. (T. 17). Plaintiff's hypertension was well-controlled with medication.

Although plaintiff mentioned his allergies at the hearing (T. 34), he did not testify that he was limited by his allergies, and there is nothing in the record to show that the allergies had any effect on plaintiff's ability to perform basic work activities.

Finally, plaintiff never mentioned any back problems to his treating physician until he saw Dr. DiGennaro in April of 2012 for right hip pain after falling. (T. 266). Although the "Nurse Note" on April 19, 2011 states that plaintiff was in for a "check up, talk about hypertension, low back pain again, [and] anxiety," as stated above, low back pain was never mentioned during the entire medical report. (T. 218-219). None of Dr. DiGennaro's assessments at the end of the April 24, 2011 report mentioned plaintiff's back. (T. 219). There are no clinical tests at all relating to plaintiff's back, no x-rays, no MRI reports or CT scans. In fact, plaintiff specifically stated that he did not see any physicians for his back because he did not think they could do anything for him, and he self medicates with Tylenol or Advil. Thus, the ALJ did not err in her severity determination.

## VIII. CREDIBILITY

### A.    Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step

analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.    Application

Plaintiff argues that although he maintained a broad range of daily activities and

takes care of his wife, these activities trigger his anxiety and cause a significant amount of stress. The ALJ recognized that taking care of plaintiff's wife was quite demanding, both physically and emotionally. (T. 18). Although taking care of his wife may trigger plaintiff's stress, the ALJ considered that plaintiff's medication was improving the symptoms. Dr. DiGennaro's reports support the ALJ's finding, notwithstanding the one time that plaintiff may have needed to increase the dosage because he had a death in the family.[20]

Plaintiff also gave inconsistent reasons for quitting his job in 2008. (T. 17). He testified at the hearing that he had to retire because of his hearing, low back pain, headaches from his eyesight, and an anxiety disorder. (T. 30). However, he told Dr. Ganesh that he retired because of his eye problems, and he was eligible for retirement. (T. 232). On the same day, he told Dr. Noia that he was unable to work only because he had to care for his wife. (T. 228). As stated above, most of Dr. DiGennaro's medical reports refer only to plaintiff's blood pressure and cholesterol. (T. 206). During his January 5, 2010 physical with Dr. DiGennaro, plaintiff denied ***any*** symptoms, including musculoskeletal, eye or ear symptoms. (T. 206). On July 12, 2011, plaintiff told Dr. Noia that he had trouble falling asleep. (T. 228). However, on August 11, 2011 and on November 15, 2011, he denied any sleep problems during Dr. DiGennaro's examinations. (T. 268, 270).

---

[20] As stated above, plaintiff testified at the hearing that he had recently increased the dosage of Citalopram because his wife was in the hospital. (T. 34). There is no medical evidence that the dosage was increased again, and even if the dosage had been increased, both instances appear to be situational in that plaintiff had a particular reason for the increase in anxiety.

Although, as stated above, plaintiff's counsel faults the ALJ for considering plaintiff's demeanor, she only considered plaintiff's concentration and ability to respond to questions in connection with evaluating the broad areas of functioning as required by the regulations. The ALJ was not specifically making a credibility finding based on her observations, even though plaintiff's demeanor may have contributed to her credibility findings. (T. 18). In any event, the case law and regulations provide that demeanor is one indicia of credibility. *Murphy v. Commissioner of Soc. Sec.*, No. 3:13-CV-960, No. 2015 WL 64440, at *6 (N.D.N.Y. Jan. 5, 2015) (citing *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)). As long as the ALJ specifies her reasons for rejecting the extent of plaintiff's stated limitations, and those reasons are supported by substantial evidence, this court must defer to the ALJ's determination. *Id.*

In this case, the ALJ considered all the factors outlined above. She considered plaintiff's daily activities; the location, duration, frequency and intensity of plaintiff's symptoms; precipitating and aggravating factors; the type, dosage, and effectiveness of plaintiff's medications; other treatment to relieve symptoms; and any measures taken by the plaintiff to relieve symptoms.[21] Thus, the ALJ's credibility determination is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

---

[21] Plaintiff undertook many daily activities and was the sole care giver for his disabled wife. This included cooking, cleaning, and all the other activities mentioned above. The ALJ correctly noted that plaintiff never mentioned most of his alleged impairments to his own treating physician, despite frequent visits to her office, and when he did discuss these impairments, he stated that the medication was working and his symptoms had improved. There was only one instance in which the doctor noted that plaintiff's anxiety was not controlled, and this was understandably a stressful situation.

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: March 3, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge